**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dustin Michael Woods,<br><br>Plaintiff,<br><br>v.<br><br>Jason Scissons,<br><br>Defendant. | No. CV-17-08038-PCT-GMS<br><br>**ORDER** |

Pending before the Court is the Motion for Sanctions of Plaintiff Dustin Michael Woods (Doc. 60). For the following reasons the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Dustin Woods brought this § 1983 action against Defendant Jason Scissons, alleging a claim of excessive force against Officer Scissons arising out of Woods' arrest in June 2016.

On June 25, 2016, Officer Scissons arrested Woods after a brief pursuit and a confrontation during which Woods attempted to pull a gun on Officer Scissons. Other officers arrived on the scene shortly after Scissons successfully disarmed Woods and handcuffed him. According to Woods' complaint, after Scissons placed him in handcuffs, Scissons struck Woods several times while he lay face-down on the pavement. Woods alleges that the incident resulted in a fracture to his lower back which has left him in severe

pain and will likely require future surgery to repair.

At some point, Officer Scissons called for medical assistance for Woods. (Doc. 60-3 at 42.) Paramedics arrived. More officers also arrived at the scene, including Sergeant Heath, Scissons' commanding officer. Heath filed a Use of Force Report two days after the incident. Heath's report concluded that Scissons' use of force was justified. (Doc. 60-3 at 41–44.) The report makes no mention of any force used after Scissons handcuffed Woods. (*Id.*) Nor does the report indicate that it was made after reviewing any recordings that may have been made of the incident by any of the police units that were present at the scene. Following the initial report, Prescott Police Department leadership determined that the incident "warranted a full Incident Review Board," which consisted of law enforcement personnel and the city attorney. (*Id.* at 46.) The Board issued its report on July 22, 2016. It concluded, after reviewing "all of the reports, the pictures associated with the call as well as the Use of Force Report," that no "criminal, civil or Department Policy violations" had occurred, and that "Officer Scissons showed great restraint and professionalism during this incident." (*Id.* at 47.) Again, however, there is nothing in the Board's report that suggested it requested, or reviewed, any of the recordings of the incident that may have been made at the scene.

Woods filed this action in February 2017. Scissons agreed to waive service of summons on April 18, 2017. (Doc. 14 at 2.) Woods now seeks spoliation sanctions, arguing that non-party City of Prescott violated a duty to preserve evidence of the alleged incident—video footage automatically captured by the cameras in the various officers' vehicles—by allowing the footage to be automatically deleted from the police department's systems.

**DISCUSSION**

**I.**     **Analysis**

    **A.**     **The Duty to Preserve Electronically Stored Evidence**

"A duty to preserve information arises when a party knows or should know that the information is relevant to pending or future litigation." *Pettit v. Smith*, 45 F. Supp. 3d

1099, 1105 (D. Ariz. 2014). "The failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." *Id.* at 1103 (quoting *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003)). Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (quotation marks and citations omitted).

Sanctions under Federal Rule of Civil Procedure 37(e) are available when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e); *see also Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (party that fails to preserve or destroys evidence subject to sanctions for spoliation). There are, broadly speaking, two categories of remedies available under Rule 37(e). Both categories require the satisfaction of the first part of the Rule—*i.e.*, the court must conclude (1) that electronically stored information was lost; (2) the loss is attributable to the failure by a party to take reasonable steps to preserve it; and (3) the information cannot be restored or replaced by more discovery.

The first category of remedies allows a court, upon finding that the loss of the information has prejudiced another party, to "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). The second category allows a court to take more drastic measures if it finds that the party "acted with the intent to deprive another party of the information's use in the litigation." *Id.* (2). Intent may be shown "when the evidence shows or it is reasonable to infer, that . . . a party purposefully destroyed evidence to avoid its litigation obligations." *Porter v. City & Cnty. of San Francisco*, Case No. 16-CV-03771-CW(DMR), 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018) (citing *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-CV-01893-HRL, 2016 WL 5870218, at *3 (N.D. Cal. Oct. 7, 2016)). If intent is found, the court may presume that the lost

information was unfavorable to the party that lost it, issue an adverse inference instruction to the jury, or even dismiss the action or enter a default judgment. Fed. R. Civ. P. 37(e)(2)(A)–(C). The Advisory Committee Notes for Rule 37 stress that the sanctions available under (e)(2) are not to be used unless a party intentionally destroyed evidence. *See* Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 Amendment.

**B.    Considerable evidence suggests that footage from the incident existed.**

Scissons asserts that there is no evidence that any video recording of the alleged incident ever existed. (*See, e.g.*, Doc. 72 at 10) ("There is no evidence that any of the Prescott police units recorded relevant footage."). This *ipse dixit* is unsupported by the facts. Vehicles in the Prescott Police Department vehicle fleet have cameras mounted on their dashboards. The cameras automatically turn on when the vehicle is turned on. Police vehicles have three "levels" for their emergency lights and siren. Level one is where the rear emergency lights are activated. (Doc. 60-3 at 28–29.) Level two is where the overhead emergency lights are fully activated. (*Id.*) Testimony from the department's evidence technician suggests that all units' dash cams automatically start recording at level two. (*See* Doc. 72-2 at 105) ("Dashcams were mounted in Prescott police vehicles and were generally set to activate automatically when overhead lights were activated."). Level three means fully activated overhead lights as well as the unit's siren. (Doc. 60-3 at 28–29.) It may be that some units' dash cams do not automatically begin recording until level three is activated. (*Id.*)

Uncontradicted testimony from multiple officers establishes that absent some equipment malfunction—evidence of which has not been presented here—video recordings would have been taken by at least some of the units the day of Woods' arrest, and that the recordings may have been relevant to his claim.

Officer Siller, one of the first officers to respond to the scene, testified that he activated his unit's lights and sirens as he drove to the scene—meaning he activated level three in his vehicle. (Doc. 60-3 at 17.) His dash cam would therefore have been recording footage, for at least part of the encounter. Siller drove into the parking lot and parked his

vehicle directly behind Woods' truck. (*Id.* at 19.) No one has contradicted this testimony, so the evidence establishes that Siller's dash cam would have been recording footage that could have been relevant to Woods' claim.

Officer Martin, another responding officer, testified that he had a dash cam in his vehicle and that he drove at level three to the scene. (*Id.* at 27, 30.) He parked his vehicle across the road from the scene and ran towards Officer Scissons' vehicle. (*Id.* at 30.) While Martin's vehicle seems to have been parked away from the scene, his dash cam would have captured video or audio that may have been relevant to Woods' claim. Martin testified that he was the first officer, other than Scissons, on the scene. (*Id.* at 33.) He also testified that when he arrived, Officer Scissons' vehicle was parked in front of Woods' vehicle with its lights and sirens on. (*Id.*) ("Q. And what did you see when you got there? A. At that point, Officer Scissons' vehicle, lights and sirens, and the truck in front of his vehicle."). Woods was already on the ground, handcuffed, and Officer Scissons was standing over him. (*Id.*)[1]

Officer Scissons, however, testified that he activated his lights (*i.e.,* at least level two) when he followed Woods' vehicle into the parking lot where the incident occurred. (Doc. 60-3 at 5.) After Woods parked his vehicle, Officer Scissons parked his unit in front of Woods' vehicle, facing it at an angle. (*Id.* at 8.) In a separate Declaration, Scissons states that his truck was parked perpendicular to Woods' vehicle, and that the "front end of [his] police vehicle extended past the front of Woods' truck and was angled . . . fac[ing] in the opposite direction from the passenger side of Woods' truck. (Doc. 72-1 at 2.) It is nevertheless possible that Scissons' could have recorded video relevant to Woods' claim.[2]

Woods' account differed. He testified that when he saw Scissons' patrol vehicle enter the parking lot, he "did not recognize lights on the top of the vehicle." (Doc. 60-3 at 38.) He also testified, in response to a question suggesting that Officer Scissons' vehicle

---

[1] This timeline does not necessarily preclude the possibility that Martin or Siller were present when the assault allegedly occurred. Woods' Complaint alleges that Scissons attacked him after he was handcuffed, and that another officer pulled Scissons off Woods and then stood between Woods and Scissons to prevent further attacks. (*See* Doc. 45 at 3.) For that reason, dash cam footage from either vehicle, but particularly from Officer Siller's vehicle, may have captured some of the alleged events.

[2] Officer Scissons testified that he did not bring the vehicle's microphone with him when he left the vehicle to confront Woods. (Doc. 60-3 at 12–13.)

had its emergency lights activated when it pulled into the parking lot, "Not that I'm aware of, no. I never seen [sic] an emergency light on." (*Id.* at 39.)

There is no testimony as it pertains to the other police vehicles that eventually arrived at the scene. Nor is there any testimony before the Court of which it is aware that suggests what would stop the recording(s) once they had begun.

But, the available evidence, taken as a whole, establishes that dash cam footage was recorded by at least two vehicles that could have been relevant to Woods' claim. Officer Siller's patrol unit had its lights and sirens activated, and so did Officer Martin's. Based on that evidence, both officers' units would have been automatically recording dash cam footage. The evidence also suggests that Scissons' dash cam may have recorded footage, since both Officer Scissons and Officer Martin testified that the vehicle's lights were activated, and Martin further testified that its sirens were on. At a minimum, this inconsistency in the testimonies suggests that evidence on this point should be presented to the finder of fact.

### C. Woods would be prejudiced by the loss of the video footage.

The deposition testimony previously discussed establishes that at least two patrol vehicles would have recorded some part of the scene of the alleged incident—the units of Officer Martin and Officer Siller—and that the unit of Officer Scissons may have as well. Those recordings may well have had relevant footage. Scissons and Siller testified that they parked their units near Woods' vehicle. The alleged incident took place on the passenger side of Woods' vehicle. Even if the exact angle was not perfect such that the recordings did not actually capture images of the incident, it is enough that the cameras may have captured any footage of the incident. *See LaJocies v. City of N. Las Vegas*, No. 2:08-cv-00606-GMN-GWF, 2011 WL 1630331, at 2 (D. Nev. April 28, 2011) ("Despite the limited viewing angle of the videotape . . . , it is likely that it did still capture at least some of the altercation (whether sights or sounds) and could have potentially assisted the jury to understand the tenor of the event and to evaluate the credibility of the witnesses who are providing conflicting descriptions").

Moreover, because "the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist," Scissons "can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (citing *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982)). The Court therefore declines to assume that any recordings from the vehicles in question would have been irrelevant to Woods' claim. The deletion of the video footage could "threaten[] to distort the resolution of" Woods' case. *Id.* (quoting *U.S. for Use and Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co., Inc.*, 857 F.2d 600, 604 (9th Cir. 1988)) (quotation marks omitted). And the footage's value cannot simply be replaced by having eyewitness testimony regarding Woods' arrest—much of the value provided by video footage is that it allows a jury to make its own determination. *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137, 1145 (D. Mont. 2009) ("The on-the-scene officers will testify the force used was entirely reasonable under the circumstances. The obvious inherent value of the video recording is that it would have allowed the jury, the arbiter of the facts, to see the actual events unfold and make its own collective assessment."). For those reasons, the Court concludes that Woods would have been prejudiced by any loss of video footage.

**A. The City of Prescott had a duty to preserve evidence but failed to do so.**

The next issue is whether the City of Prescott, as a non-party, had a duty to preserve the video footage from the officers' dash cams. A similar question was presented in *Pettit v. Smith*. In that case, a prisoner brought a § 1983 action against department of corrections employees. 45 F. Supp. 3d at 1102. A video recording of the alleged incident was intentionally deleted by non-party prison employees, and other related pieces of evidence went missing. *Id.* at 1103–04. The defendants argued that spoliation sanctions were inappropriate because the Arizona Department of Corrections ("ADC") was not a party to the case and they (the defendants) had no personal culpability for the destruction of the missing evidence. *Id.* at 1106. The court disagreed, reasoning that although ADC was a non-party, it was not a disinterested non-party. *Id.* Rather, ADC was the entity that had

complete control over evidence that it reasonably should have known would be relevant in future litigation. *Id.* Further, ADC was an agent of the State of Arizona, which was statutorily obligated to indemnify its employees for "any damages for which the employee becomes legally responsible if the acts or omissions resulting in liability were within the employee's course and scope of employment." *Id.* (quoting Ariz. Rev. Stat. § 41-621(P)) (quotation marks omitted). Since ADC "control[ed] the evidence and who ha[d] access to it, and the State [was] defending [the] case and w[ould] pay any judgment that results from it," the court concluded that ADC was not a disinterested third party. *Id.* Indeed, ADC was in precisely the same position as parties on whom courts regularly impose a duty to preserve evidence. *Id.*

So too here. The Prescott Police Department, as an agency of the City, exercised exclusive control over any video recordings of the incident. Officer Scissons did not himself control the video.[3] Like the prisoner in *Pettit*, Woods would have had no access to the video. Woods asserts, and Scissons does not contest the assertion, that the City of Prescott pays for legal representation of Officer Scissons and would indemnify him for any judgment entered against him. (Doc. 60 at 8.) Like ADC, the City of Prescott occupies the same position as parties on whom the court regularly imposes a duty to preserve evidence. The City of Prescott therefore had a duty to preserve any video recordings from the responding officers' dash cams once it knew that litigation was reasonably likely. *Id.* (citing *Wilson v. Beloit Corp.*, 921 F.2d 765, 767 (8th Cir. 1990)).

But the City failed to do so. As testimony from a department evidence technician establishes, there were no requests made for any footage that may have been recorded that day, (Doc. 72-1 at 105–06), and the parties do not dispute that any footage has been erased.

**B.     The duty arose before the video would have automatically been erased.**

The duty to preserve evidence "arises when a party knows or should know that the information is relevant to pending or future litigation." *Pettit*, 45 F. Supp. 3d at 1105. "The

---

[3] An evidence technician for the department testified that recorded video footage is automatically uploaded to the department's servers when the police vehicle is near the police station. (Doc. 72-1 at 105.)

duty to preserve is triggered not only when litigation actually commences, 'but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation.'" *Id.* (quoting *Suroweic v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011)).

Even before the City was aware of the actual litigation, the City should have foreseen that litigation could arise from Woods' arrest. The "Use of Force Report" for the alleged incident was completed on June 28, 2016. (Doc. 60-3 at 41.) That report concluded that Scissons used appropriate force, but did so, apparently, without requesting to review any possible recordings of the incident. (*Id.*) But the City was aware that this was not a run-of-the-mill case. Officer Scissons had deployed a taser against the subject and was involved in a physical altercation with Woods in which he "delivered several knee strikes to [Woods'] body. (Doc. 72-1 at 84.) Scissons' actions to subdue Woods were severe enough that Scissons called for medical aid to assist Woods. (*Id.*) Based on this, the City determined that the arrest warranted further internal review by the Incident Review Board. (*See id*. at 46.) That review was completed on July 22, 2016, but again was apparently finished without a request to review the possible recordings of the incident. (*Id.*) Because the City determined that a heightened level of review of the incident was warranted and that Woods had required medical assistance, it should have known that the incident might have resulted in litigation. Since the date of the decision to assemble a full Incident Review Board is not clear, the date of the issuance of that Board's decision—July 22, 2016—functionally approximates the date on which the City's duty to preserve the video footage would have arisen.

And even if the City's duty did not arise by that date, the City had actual knowledge that litigation was occurring by April 18, 2017. Officer Scissons received a waiver of service of summons and agreed to waive service on April 18. After that date, the City knew that litigation was occurring. Both July 22, 2016 and April 18, 2017 were less than one year after Woods' arrest on June 25, 2016. At either of these points, the video footage would have still existed. (See Doc. 72-1 at 106) ("In June 2017, the police server was

programmed to erase video non-segregated footage 366 days after upload to the server.").

Prescott Police Department was aware that its patrol vehicles recorded dash cam video and was also aware that litigation was occurring. For these reasons, the City had a duty to preserve the video footage that arose before the date on which the footage would have been automatically deleted from the servers pursuant to Prescott Police policy.

### C. The spoliation can be imputed to Scissons.

The question of whether spoliation by a non-party employer can be imputed to an employee that is a party has not been answered by the Ninth Circuit. District courts within the circuit have split. *See Pettit*, 45 F. Supp. 3d at 1110 (finding "strong reasons" to impute spoliation by employer to employee, but declining to do so because other movant failed to show that case-dispositive sanctions were appropriate); *Ramos v. Swatzell*, No. ED CV 12-1089-BRO (SPx), 2017 WL 2857523, at *7 (C.D. Cal. June 5, 2017) (spoliation by employer may be imputed to employee "to avoid unfair prejudice to plaintiffs"); *Peters v. Cox*, 341 F. Supp. 3d 1192, 1194–95 (D. Nev. 2018) (disagreeing with proposition that "individual defendants could be sanctioned for spoliation caused within a prison system over which they had no direct control" because doing so raised Seventh and Eleventh Amendment concerns); *Gemsa Enterprises, LLC v. Specialty Foods of Alabama, Inc.*, No. LA CV13-00729 JAK (RZx), 2015 WL 12746220, at *9–*10 (C.D. Cal. Feb. 10, 2015) (declining to impute spoliation by employee to employer because employee was not acting as employer's agent in spoliating evidence).

On the facts of this case, it is appropriate to impute the spoliation of the video recordings by the Prescott Police Department to Scissons for the purpose of imposing sanctions. First, as previously discussed, the Police Department is not merely a disinterested non-party. Woods has alleged—and Scissons has not refuted—that the City would pay any judgment against Scissons in this case. The City's incentives for preserving evidence thus align with Scissons' and the City is therefore in the same functional position as other parties subject to sanctions for spoliation. *Cf. Pettit*, 45 F. Supp. 3d at 1106 ("ADC is in the same position as parties on whom courts routinely impose a duty to preserve.").

Further, allowing the Police Department to destroy evidence and then declining to impose appropriate sanctions simply because it is not a party could incentivize such behavior by future non-party indemnifying employers. Additionally, leaving Woods without a remedy here for the destruction of relevant evidence would be an unjust result. *See Pettit*, 45 F. Supp. 3d at 1110 ("For the same reasons that the Court found that ADC had a duty to preserve the evidence lost in this case, the Court finds that there is strong reason to impute the spoliation of ADC to Defendants to ensure that fairness is done at trial."); *Swatzell*, 2017 WL 2856523, at *7 ("CIW's spoliation of Garcia's personnel file and breach of duty to preserve evidence may be imputed onto Garcia to avoid unfair prejudice to plaintiffs.").[4]

### D. What measures are appropriate?

Under Rule 37(e), if electronic evidence that should have been preserved is lost because the party that should have preserved it failed to take reasonable steps to do so, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). In order to impose any of the sanctions listed in 37(e)(2), however, there must first be a determination that the spoliating "party acted with the intent to deprive another party of the information's use in the litigation." The Court declines to make such a finding on the facts before it now on this motion. However, for the reasons discussed, it is appropriate to allow the parties to present evidence to the jury regarding the potential existence of video footage that was subsequently erased. The jury will further be instructed that the City of Prescott had a duty to preserve the evidence. The jury will thereafter be allowed to make its findings with all the facts in mind pertaining to the possibly deleted recordings. It will be instructed that, should it conclude, based on the evidence produced at trial, that the City of Prescott or the Prescott Police Department destroyed evidence and

---

[4] The Eleventh Amendment concerns discussed in *Pettit* and *Peters* are absent here because the entity whose spoliation is being imputed to Scissons is a municipality rather than a state entity. The Supreme Court has consistently held that state sovereign immunity does not bar suits against municipalities. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 757 (1999) ("The second important limit to the principle of sovereign immunity is that it bars suits against States but not lesser entities. The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State.").

acted with the intent to deprive Woods of the use of the videotape during this litigation, it may assume that the video footage would have been favorable to Woods.

This remedy is no greater than necessary to cure the prejudice, *see* Fed. R. Civ. P. 37(e), would allow the determination of intent to be made on a more fully developed evidentiary record, and is in harmony with the Advisory Committee Notes to the rule.[5]

**CONCLUSION**

Because there is evidence that video recordings of the alleged event existed but were not preserved, the jury will hear evidence concerning the potential existence of video footage and will be instructed that it may consider that evidence along with all other evidence in reaching its decision. It will also be instructed that if it determines that the Police Department destroyed evidence and did so with the intent to deprive Woods of the use of the video footage, it may infer that the footage would have been favorable to Woods. However, the Court declines to give the instruction as requested by Woods because the question of intent will be submitted to the jury.

**IT IS THEREFORE ORDERED** that Plaintiff Dustin Woods' Motion for Spoliation Sanctions (Doc. 60) is **GRANTED in part and DENIED in part** as discussed in this Order.

Dated this 14th day of August, 2019.

_____
G. Murray Snow
Chief United States District Judge

---

[5] *See* Fed. R. Civ. P 37(e) committee's notes to the 2015 Amendment ("Subdivision (e)(2) requires a finding that the party acted with the intent to deprive another party of the information's use in the litigation. This finding may be made by the court when ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial. If a court were to conclude that the intent finding should be made by a jury, the court's instruction should make clear that the jury may infer from the loss of the information that it was unfavorable to the party that lost it only if the jury finds that the party acted with the intent to deprive another party of the information's use in the litigation.").